[Crim. No. 599.   Third Appellate District.—June 20, 1922.]

# THE PEOPLE, Respondent, v. JOHN A. SPENCER, Appellant.

[1] CRIMINAL LAW—MURDER—CORPUS DELICTI—PROOF.—In a prosecution for murder, the basis of the *corpus delicti* is the finding of a dead human body, or its remains, and the identification thereof as that of a person charged to have been slain, and the *corpus delicti* may be proved by the very facts that connect the defendant with the commission of the crime.

[2] ID. — CIRCUMSTANTIAL EVIDENCE — VERDICT — APPEAL. — In this prosecution for murder, the case was replete with circumstances, in their nature highly incriminatory and tending strongly to the establishment of the proposition that the death of the deceased was the direct result of the criminal act of the defendant, and the appellate court could not say that the jury was not warranted in reaching the conclusion that the deceased was drowned by the defendant.

[3] ID.—IMPEACHMENT OF OWN WITNESS—FOUNDATION—CODE SECTION CONSTRUED.—The purpose of section 2049 of the Code of Civil Procedure is to permit a party who has, in good faith, placed a witness upon the stand, with the distinct understanding that he will give testimony in support of his side of the issue, but, instead of so doing, and to the surprise of the party presenting him as such witness, he has given damaging testimony against said party, to show that, prior to giving his testimony, he made a statement which, if testified to, would be favorable to the party so making him his witness.

[4] ID.—ABSENCE OF SURPRISE—PRIOR EXTRAJUDICIAL STATEMENTS—HEARSAY.—In the absence of a showing that a party, when he put a particular witness on the stand, expected any other testimony from him than that given by him, it is error to permit that party to show extrajudicial statements made by said witness, at some time prior to the giving of his testimony, whether or not there is any material variance between the two statements.

[5] ID.—ABILITY TO HEAR SCREAM—EXPERIMENTS—EVIDENCE.—In this prosecution for murder, the trial court did not commit error in admitting evidence relating to a test made by the prosecution, pending the trial and before the people had closed their case, for the purpose of showing that the scream of a woman while at a given place could be heard by a person at another given place,

1. Definition of *corpus delicti* and necessity of proof, notes, 78 Am. Dec. 252; 1 Ann. Cas. 823.

5. Experiments as evidence, note, 53 Am. St. Rep. 375.

which places were the ones described by a witness for the prosecution who testified that he heard a scream on the night of the murder, the atmospheric and other conditions having been substantially the same on the night that the experiment was made as they were on the night of the murder.

APPEAL from a judgment of the Superior Court of Lake County. M. S. Sayre, Judge. Affirmed.

The facts are stated in the opinion of the court.

Sidney P. Robertson for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—Convicted of murder of the first degree, with the penalty fixed by the jury at imprisonment for life (Pen. Code, sec. 190), the defendant has appealed to this court from the judgment of conviction. The defendant did not move for a new trial.

The assault upon the verdict is predicated upon the following grounds, generally stated: First. That the evidence wholly failed to establish the *corpus delicti.* Second. That hearsay evidence prejudicial to the rights of the accused was, over objection by the latter, admitted. Third. That ''a certain demonstration was carried out by the prosecuting officers during the trial'' to the manifest detriment of the rights of the defendant. Fourth. That the people were allowed to impeach one of their own witnesses ''without having first laid the foundation for the same.''

The conviction of the defendant was obtained entirely by means of circumstantial evidence and the circumstances brought before the jury for the purpose of bringing home to the defendant the commission of the alleged crime were multifarious. A consideration of the errors assigned by the defendant will require an extended examination and review of the evidence herein for the purpose of determining, first, whether the *corpus delicti* has been sufficiently shown, and, if so, second, whether, assuming that the other points urged as in impeachment of the validity of the result reached by the jury are sound as legal propositions, we are required to declare that a miscarriage of justice has followed from the errors thus assigned.

As above suggested, the evidence consisted of a concatenation of varying facts and circumstances which, it is vigorously claimed by the people, irresistibly led to the conclusion that the accused was guilty of the crime charged beyond all reasonable doubt, and, therefore, in stating the facts and the circumstances adduced before the jury we shall assume, as we are authorized to do, that the jury, having evidently accepted as verity the evidence by which they were shown, by their verdict found said facts and circumstances or such of them as are indispensably essential to the support of the verdict, if the same be supportable at all, to be true.

The defendant, although an ordained minister of the gospel, was, for many years immediately prior to the date of the commission of the crime with which he was charged, actively engaged in the business of a real estate dealer or broker in the city of Santa Rosa, this state. The person whose life he is alleged in the indictment to have taken was Mrs. Emma Spencer, the wife of the accused, it being alleged in the accusatory pleading that on the twenty-sixth day of July, 1921, in the county of Lake, he killed and murdered his said wife. The defendant owned a small tract of land situated and bordering upon what is known as Konocti Bay, an arm of Clear Lake, in the said county of Lake. On this land there was a cabin which he and the deceased had used for a number of years prior to the death of Mrs. Spencer as a summer home. This cabin was situated near a wharf, known as the "Holt & Gray" wharf, and also, at some time, as the "Jimmy Ford" wharf, but for convenience it will hereafter be referred to as the "Holt wharf." At this wharf the small boats owned by persons living on that side of the bay or lake and which were used for pleasure and perhaps business purposes were customarily moored when not in use. A short distance from the Holt wharf there was an Indian camp, which, as we understand the record, was located on what is known as the "Wheeler Ranch." On practically the opposite side of Konocti Bay from the Spencer cabin and Holt wharf there resided a number of families, among whom were Mr. and Mrs. Robert Siddell. A wharf, known as the "Siddell" wharf, which was about five feet by one hundred and eighty feet in dimensions, was maintained in Konocti Bay on the

Siddell side thereof. This wharf was situated a little less than two hundred feet from the dwelling-house of the Siddells, but the distance between the water line and the sleeping-porch connected with the Siddell house was approximately one hundred and twenty feet. A "well-beaten" path extended from the Siddell wharf to the Siddell residence. The approximate distance between the Holt wharf and the Siddell wharf was two thousand five hundred feet.

The defendant was the owner of a small boat in which he and the deceased frequently made pleasure cruises on the lake and in which they also now and then visited friends living on the opposite side of the bay from their home.

On the night of July 26, 1921, near the hour of half-past 9 o'clock, the Siddells, who had retired for the night on their sleeping-porch (the husband at approximately half-past 8 and his wife at an hour later), were awakened by loud calls addressed to Mr. Siddell by some man whose identity was then unknown to the Siddells. Mrs. Siddell had hardly passed into sleep, or, as she described it, she was "just dozing" when she heard a man call twice in quick succession for her husband. She immediately awakened her husband, who was at the time in "a sound sleep," and told him that "Someone wants you." Siddell, on thus being aroused from his sleep, asked in a loud voice who it was that wanted him, to which the defendant replied: "Siddell, Siddell, a rope! My wife is in the lake! This is Mr. Spencer calling." Both Siddell and his wife hastily arose from their bed and started toward the front door. They saw the defendant standing inside the house a short distance from the front door, near where the piano stood in the front room, it being their custom to leave the door of the house open at night during the summer season. Spencer, who was drenched with water, then started hastily toward the Siddell wharf, Mr. and Mrs. Siddell, the latter with a lighted lantern, rapidly following. Mrs. Siddell, as they were proceeding toward the wharf, passed the lantern to her husband, and then ran to the home of Mr. and Mrs. Renfro, near neighbors, and told them of the occurrence. Mr. Renfro immediately rushed to the wharf, followed by his wife and Mrs. Siddell.

The defendant reached the wharf a little ahead of Mr. Siddell, and, just as the latter got there, the defendant, pointing to the water near where his boat was fastened to the wharf, exclaimed: "There she is now." Siddell then observed the body, face downward, floating on the surface of the water between the defendant's boat and the wharf, the boat lying almost at a right angle with the wharf. There was considerable of the body exposed above the surface of the water and which with the aid of the lantern was plainly visible. The deceased had no hat on her head and her hair was "down or torn loose." The defendant jumped into the boat and reaching out got hold of the body and steered it toward and near enough to the wharf to enable Siddell, in a kneeling position, to get hold of it and draw it from the water to the wharf. While all this was going on the defendant exhibited no signs of emotion. Indeed, his manner was rather that of complacency of mind than an indicium of excitement or sorrow or grief as he gazed into the face of the deceased and remarked to Siddell: "She does not look as though she suffered any."

The body, having been brought to the wharf, and, although it must have been manifest from the fact that the face and part of the head were submerged that life had already passed out, efforts at resuscitation were vigorously made by Mr. Siddell, assisted by the defendant. Siddell told the defendant to place "his hands under and lift at the shoulder." "Lift her up, bend her up," Siddell instructed the defendant and the latter did as so requested, Siddell, at the same time, placing his hand under the forehead and holding the head above the floor of the wharf. The result was that a large quantity of water came out of the mouth of Mrs. Spencer. After being satisfied that all the water that could be expelled had thus been removed from the body, Mrs. Spencer was turned upon her back and an effort made to superinduce respiration by working the arms back and forth. But all efforts at resuscitation were futile. It was obvious that life was extinct, as undoubtedly was the fact before the body was removed from the water. There were no visible marks of violence upon the face or head of the deceased, and the body, according to one of the parties present, was still a trifle warm. The defendant, after the unavailing attempt at resuscitation,

kneeled down and, looking into the immobile countenance of his dead wife, and without the slightest betrayal of excitement or perturbation of mind or heart, remarked to Mr. Siddell: "It is a peaceful face, Bob." Siddell asked the defendant: "Why, man, why didn't you call—why didn't you holler [halloo]?—I would have been there instantly," to which the defendant replied: "My only thought was I must get her myself."

The body of the deceased was removed to the home of the Renfros and a doctor and the coroner immediately telephoned and apprised of the disaster.

The story told by the defendant to the Siddells and the Renfros as to how he came to essay a visit to the Siddells at that hour of the night and the circumstance of his wife falling into the lake was in substance this: That the deceased was making for herself a khaki skirt, that she required some thread which would match the material from which the skirt was to be made, that, knowing that Mrs. Siddell was having some dentistry work done at Lakeport, to which place she made trips two or three times a week for that purpose, usually starting very early in the morning, and, believing that she intended going to Lakeport the following morning, she (deceased) persuaded the defendant, against his wish or desire, to take her in their boat to the Siddells on the night of the unfortunate occurrence so that she could request Mrs. Siddell to purchase at Lakeport the thread needed by her, the deceased insisting, while importuning the defendant to take her to the Siddells, that Mrs. Siddell would probably leave her home for Lakeport the following morning before the deceased could get to the Siddell residence. The defendant and the deceased left the Holt wharf in their boat, so the defendant explained, at some time prior to 9 o'clock. On reaching the Siddell wharf the defendant, so he continued to state, stepped out of the boat and on to the wharf and was in the act of fastening the "painter" or the rope attached to the bow of the boat to the wharf when he heard a "splash." On looking into the boat and in the direction of where his wife sat while they were going to the Siddell wharf he discovered that she was not in the boat; that (so he expressed his belief) she must have made an attempt to leave the boat without his assistance, made a misstep, lost her bal-

ance, and so fell into the water. He thereupon, so he stated, immediately dove into the lake in an attempt to rescue her and repeated the act three different times but without avail. It was then that he hastened to the home of the Siddells, gave the alarm and called for assistance. At no time on this occasion did the defendant appear to be grieved over the loss of his wife. His manner, so far as external appearances disclosed, was no different from what it usually was.

The coroner, with a jury of six persons, held an inquest into the cause of the death of the deceased the day following. At this hearing Robert Siddell and the defendant were the only witnesses examined, and the verdict was that Mrs. Spencer had come to her death by ''accidental drowning.'' During the progress of the inquest some person suggested that the deceased might have been suffering from an affection of the heart which either directly caused her death or caused her to suffer a sudden fainting spell or an attack of dizziness just as she was in the act of leaving the boat and thus she fell into the lake. The defendant was thereupon asked if his wife was afflicted with heart trouble, to which he replied that prior and down to the time of her death she had been afflicted with ''serious heart trouble.'' In this connection, it should be stated, that on the night Mrs. Spencer lost her life and at the time her body was taken from the water, as above described, the defendant made no suggestion that the deceased had suffered from a heart affection of any character.

It appears that it was only a few days after the deceased had been laid away in the grave that there arose in the minds of the public authorities of Lake County a feeling of suspicion that the death of Mrs. Spencer had not been truly accounted for or explained by the defendant. There were other significant circumstances than those immediately attending the death of Mrs. Spencer and above recited which imparted additional strength to the suspicion that the death of the deceased was neither accidental nor brought about by a natural cause. The circumstance that the body of the deceased remained on the surface of the water after, as defendant explained, she had fallen into the bay, appeared to have taken on a more serious aspect after the remains of the deceased had been deposited in the grave

than it seemed to bear in the minds of the authorities on the night Mrs. Spencer met her death and for a day or two succeeding that deplorable event. Upon reflection it occurred to the authorities, probably after consultation with physicians and other persons having experience in cases of death by drowning, some of whom, as will presently be seen, so testified at the trial, that the body of a human being meeting death in that manner in a body of fresh water would invariably sink beneath the surface and remain entirely submerged from five to six or perhaps from eight to ten days before returning to the surface, but that a dead body thrown or falling into a body of water would remain on the surface. Then it developed that the defendant, on the day succeeding that of the death of his wife, addressed a letter to a friend, a Mrs. Charmley, of Santa Rosa, and on the twenty-ninth day of July, 1921, addressed a letter to Rev. Dr. Ingram, also of Santa Rosa, in each of which he apprised the addressee of the death of Mrs. Spencer, and in the first-mentioned of which he stated, among other things, that "while visiting an old friend, Mrs. Spencer, in stepping from the boat to the wharf, lost her footing and fell in the Lake. I at once dived overboard, the water was very deep, and I dove down four times. I could not find her. Our kind host and wife, together with other friends that gathered on the wharf, assisted in the rescue. It was not until some moments later that we saw her body floating on the far side of the boat—the very place that we had not thought to look. . . . Hard as this misfortune is to me, for I had, in common with herself, many nice plans for the future, yet I am grateful to think *that it took place in the presence of witnesses,* and at the public wharf. The evil tongues that have done so much mischief in the past can find nothing here." In the letter to Dr. Ingram he stated that the "accident" occurred while they were visiting friends and were guests "at the beautiful home of Mr. and Mrs. Robert Siddell, and it was at his private wharf where the occurrence took place"; that, assisted by said friends and others, an effort was made to revive Mrs. Spencer and that in thus working at resuscitation "water came from her lungs and stomach in streams, and yet, from the calm and cheerful expression of countenance that she wears in death, I and our friends are in-

clined to think that she suffered no pain—that the sudden-
ness of the thing might have gone to her weak heart. . . .
The verdict of the coroner's jury is 'accidental drowning.'
If such a misfortune had to be, I have at least cause to be
thankful that it took place where it did at the home of a
prominent and much respected family, *with they and other
friends present.* This I believe to be a fortunate circum-
stance, in view of the evil tongue and its uses, of that
woman who seemed to make it an object in her life to do me
and my wife no good.''

It was further learned that, at approximately the hour
of half-past 8 o'clock on the night of the death of Mrs.
Spencer, Hudson Jack, an Indian boy of the age of eighteen
years, who was then at the Indian camp above referred to,
which, as seen, was located not far distant from the Holt
wharf, just after he had retired for the night, heard a
scream from a human voice, the sound of which proceeded
from the direction of said wharf. This lad could not say,
so he protested at the trial, whether the scream was that
of a male or a female, but did say that it was a light voice,
meaning, as the jury could reasonably have inferred, that
it was not the coarse voice characteristic of a male but the
voice of a female.

Being in possession of knowledge of the above circumstances,
all of which were later brought out at the trial, the authorities
felt justified in indulging the suspicion that the death of
the deceased had been brought about by some foul means.
At any rate, positive dissatisfaction with the finding of the
coroner's jury that the death of Mrs. Spencer was caused
by ''accidental drowning'' followed, and a thorough and an
immediate investigation of the case was determined upon.
To that end, the first step taken was the exhumation of
the body and the holding of an autoptical examination.
This proceeding took place on the thirteenth day of August,
1921, sixteen days after the burial of the body, the autopsy
having been made by Dr. Craig, of Lakeport. Nothing
of importance was developed as the result of this examina-
tion, except that thus it was discovered that the deceased
had suffered from what the doctors described as ''involve-
ment of the mitral valve'' of the heart, or, in less technical
language, the thickening of said valve, an affection which the
autoptical physician declared, as did another doctor at the

trial, was not of a serious nature. Indeed, the doctors declared that such heart affliction is common and that seldom, if ever, does death result from that cause alone.

The facts and circumstances above narrated, including the commonly known fact that the body of a person drowned in a body of fresh water of any considerable depth (the bay at Siddell's wharf was ten to twelve feet deep) would ordinarily sink below the surface, while a dead body thrown into such a body of water would remain on the surface, had the effect of transmuting suspicion into a conviction that the deceased had been deprived of her life by the act of her husband and of giving birth to the theory that death in some manner had been produced at or near Holt wharf and the body conveyed in the boat by the defendant to Siddell wharf and there by him thrown into the bay. Acting upon this theory, the officers of the law turned their attention to Holt wharf, near which is situated the Spencer home and from which proceeded the sound of the scream heard by the Indian boy.

By her more intimate friends, it was known that the deceased always wore a hat and a certain shawl when visiting among her friends or sailing with her husband on the lake. As seen, when her body was first observed floating in the bay and then taken from the water the deceased wore neither a hat nor the shawl referred to. Having gone out upon the bay in the night-time, the circumstance that she wore no hat or shawl on that occasion was so unusual that it excited the particular attention and comment of those who were familiar with her custom in that respect. Following out the theory as to the place and manner of Mrs. Spencer's death upon which the officers were then working, it was conceived that the deceased, at the time of her death, probably wore upon her head a hat and perhaps the shawl she was usually seen to wear about her shoulders, and the officers thereupon decided to and did cause the bay to be dragged in near proximity to the Holt wharf. This investigation was conducted in the month of August, 1921, and the result thereof was that a shawl was taken from the bottom of the bay at the point mentioned. When the grappling hook clutched the shawl and an effort made to draw the hook to the surface some resistance to the pull was experienced—such resistance as might reasonably be

supposed to be caused either by the article attached to the hook being weighted down or being caught in some obstruction at the bottom of the bay. The resistance was overcome, however, before the article or, as it proved to be, the shawl was brought to the surface, it having been unloosened by the manipulation of the hook from the rocks or other obstruction at the bottom of the bay by which it was held down or with which it had become entangled. The shawl which the deceased had often been seen to wear wrapped about her shoulders and head was an old one, it having been given to her, so she stated to her friends, by her mother. The shawl was red, with white threads running through it, but the shawl taken from the bay, as was plainly manifest from an inspection thereof, had faded, a change which had undoubtedly been wrought by its having been in the water for several weeks; yet the women who knew the shawl worn in her lifetime by Mrs. Spencer appeared to be quite positive at the trial (and probably so declared to the officers prior to the trial and while the investigation was on) that the shawl taken from the bay bore in all respects a pronounced similarity to the shawl owned and worn by the deceased.

The further discovery was made in the course of the preliminary investigation that in the months of May and June, 1921, the deceased, being the owner of certain real property and interested in certain promissory notes and mortgages, executed to the defendant her deed to the real property and an assignment of her interest in the promissory notes and mortgages referred to, the first instrument having been executed on the twenty-eighth day of May and the other on the fourth day of June, 1921. It was also shown that the defendant at about the same time executed a deed conveying his interest in certain real property to the deceased. These documents were delivered into the possession of the real estate firm of Johnson & Temple, at San Jose, with instructions that the instruments should be delivered to the survivor upon the death of the other, and their possession was so maintained until some time in the month of August, 1921, when the defendant appeared at the office of said Johnson & Temple and demanded and received the same.

The investigation now reached a stage where an inquiry into the domestic relations existing between the defendant and the deceased and the personal conduct of the former with respect to his marital obligations was involved. This phase of the investigation brought forth, as will be observed, disclosures of potent significance when considered with the other facts and circumstances already within the knowledge of the officers.

As seen, the defendant was for a considerable period prior to the death of Mrs. Spencer engaged in the real estate business at Santa Rosa, where he with Mrs. Spencer also resided. The defendant was the owner of. improved property in a suburban part of the city of San Jose, which was at the time of the death of Mrs. Spencer, and had been for some months, under lease to and occupied by a Mr. W. A. Miller and his wife.

It was discovered that for a number of months before the death of Mrs. Spencer the relations between the defendant and his wife were of the most unhappy character. It is not necessary to give herein the details of the violent quarrels and disagreements occurring between them from time to time. It is enough to refer to them in a general way, as the circumstances thereof were minutely detailed at the trial by near neighbors who were in the immediate presence of the couple when the controversies referred to occurred or who overheard them. Spencer had often been heard to abuse his wife by addressing to her opprobrious epithets of the most indecent character and expressing himself when quarreling with her in the most offensive profanity. On one occasion he was heard to call his wife "a G——d d——n b——h," and when asked why he thus addressed his wife, replied that she had accused him of maintaining illicit relations with a certain married woman in San Jose, the initial letter of whose married surname is D., as we shall, out of deference to her family, hereinafter refer to said married woman. On the same occasion, Mrs. Spencer, during the quarrel then going on between them, excitedly stepped from his real estate office, where the trouble occurred, into an adjoining room, and likewise exclaimed to the lady occupying the latter room, within the hearing of the defendant, "that man in the next room is killing me." Mrs. Spencer was crying at the time and

described as being in a highly nervous condition. There were many other occasions on which the couple were heard in violent quarrels, during the course of which the defendant used abusive language towards his wife. During one of these outbursts the deceased, in effect, declared to the defendant that she knew enough about him to send him to prison. It was learned and shown that the genesis of the dissensions and violent controversies which sporadically occurred between Spencer and his wife was in a suspicion entertained by Mrs. Spencer and founded upon certain circumstances coming to her knowledge that her husband was maintaining a liaison with the Mrs. D. above referred to. As to this, it transpired that Spencer had leased an apartment to Mrs. D. in an apartment house in Santa Rosa and that for several months he paid much attention to that party and was often seen to visit her apartment both in the day and in the night time. Mrs. Spencer, it was shown, was taken ill in the month of December, 1920, and the defendant, having occasion at that time to visit San Jose, requested a neighbor (a Mrs. Palmer) to take Mrs. Spencer to her home and there give her the attention she required until his return a few days hence. It seems, though, that Mrs. Spencer, still ill, remained at Mrs. Palmer's and was under her care from the seventh day of December, 1920, until the latter part of January, 1921, during which period of time Spencer would visit her twice a day—once early in the morning and once early in the evening, remaining each time from five to ten minutes, and, particularly in the evenings, excusing his brief visits upon the pretext that "he had another important appointment." It was during this time that Spencer was seen to visit the apartment of Mrs. D. For about two months after Mrs. D. took the apartment referred to, Mrs. Spencer on several different occasions accompanied her husband in his visits to Mrs. D., but after the expiration of that period Mrs. Spencer ceased such visits and, having evidently reached the conclusion that her husband had conceived an infatuation for that party, began interposing protests against his further attentions to the lady, and on one occasion was heard to beseech him with much fervor to cease his attentions to her. Spencer, however, continued to visit Mrs. D. as regularly as above stated, often remaining with her from two to three

hours. "As time passed on," said the lady occupying the apartment adjoining that of Mrs. D., "up to the time Mrs. D. left the apartment Spencer's visits to the latter became more frequent."

A letter in an envelope addressed to the Mrs. D. at the apartment referred to above and postmarked "Santa Rosa, Cal., Dec. 14, 1920, 7:30 A. M.," and in the handwriting of the defendant, according to the positive affirmation of a former associate of the latter in business, who was familiar with the defendant's handwriting, was found, and said letter was introduced in evidence at the trial. This letter was signed "J" (the defendant's name is John A. Spencer), and was written while Mrs. Spencer, still an invalid, was stopping at the home of Mrs. Palmer. Here we pause to suggest in this connection that, assuming as we may that the jury, considering the letter by the light of all the other facts and circumstances to which we have above referred and those which are to follow and which were brought to their attention, drew the inference, as well they might, that the defendant was its author, the letter constitutes a cogent circumstance among those introduced upon the question of motive, and motive, it may be added, while of no importance where the commission of a crime is directly brought home to an accused, is peculiarly of significant consequence in this case in which the crime charged, if sufficiently proved at all, was established by circumstantial evidence pure and simple. The letter is here presented:

"11:30 P. M.

"My only sweetheart.

"I am writing a late letter to you tonight, darling, for I have just returned from Mrs. P. and find Mrs. S. very poorly. Mrs. P. says it will not be best for you to come to see her for a few days, as her poor weak mind has been so poisoned by falsehood that she does not know who are her best friends. Of course, I know that Mrs. P. has had her share in this, in spite of her statements to the contrary, and I accused her of it tonight, love, but dearest, in spite of this or anything else, there will be no change in our love. We will see each other and confess our love to each other, just the same, darling. My love, do not come before 7:30 tomorrow night, as I will have to wait,

have to visit Mrs. S. until almost that time, dear, I will
have the room warm for you, and we will have a lovely
hour together, sweet love. Do not tell anyone, dearest, that
Mrs. S. is this way towards you, and they will not know.
She will change in time. Your long letter did me much
good, darling, and I will count the minutes 'till tomorrow
evening. You can tell D. that you are going to Mrs. P. as
you intended. I am a little anxious about the letter you
gave Mrs. C. to mail for you. It will be''—several dashes
—''if she read it. We won't never give a letter or write,
dear, to any other again. They may mean our great loss
to each other.

"Good night, my very own, forever,

                                              ''J.''

The ''D.'' referred to in the letter as the person to whom
it was therein suggested Mrs. D. could tell that she ''was
going to Mrs. P. as you intended'' the jury could have
well inferred was the husband of Mrs. D.

Mrs. D. occupied the apartment mentioned from October,
1920, until March, 1921, and to the last the defendant kept
up his practice of visiting her as indicated above. As the
attention paid to Mrs. D. by the defendant became the
more intensive, dissensions between the latter and his wife
became the more aggravated and developed into a subject
of common knowledge and like discussion among their im-
mediate friends, and it is fairly and reasonably inferable,
from the whole evidence upon this phase of the case, that
the undue attentions of Spencer to Mrs. D. soon assumed
the form and proportions of an ugly scandal—so much so,
indeed, as to have prompted Mrs. D. to remove from the
apartment occupied by her and in fact abandon Santa
Rosa as her place of residence. The last of February,
1921, Mrs. D., assisted by the defendant, packed her furni-
ture and left said apartment, and she is next found in
the city of San. Jose, where she and the defendant, as hus-
band and wife, and under the pseudonym of ''Mr. and
Mrs. Barber,'' secured an apartment first from a Mrs.
Burchfiel, at 21 East Santa Clara Street, which together
they occupied from the 1st of March, 1921, until about
the twelfth day of May, 1921, when they removed there-
from and took an apartment in an apartment house con-
ducted by Mr. and Mrs. Leroy A. Rodgers, at 128 North

Tenth Street, San Jose. They there also represented them-
selves as husband and wife and as "Mr. and Mrs. Barber."
Mrs. D., while living in San Jose under the circumstances
as indicated, always, in speaking of Spencer to her land-
ladies, referred to him as her husband. The defendant
represented to these apartment house owners that he was a
traveling salesman for a "book concern" and was, there-
fore, compelled to be away from home a good part of the
time. Thus he accounted for his absence "from his wife"
(Mrs. D.) for several days or a week at different intervals
of time. Mrs. Burchfiel and the Rodgers testified that,
when the defendant was in San Jose, they saw him at
the apartment with Mrs. D. and would observe him in
said apartment in the evenings and leaving there early
in the mornings. There was but one bed in each of said
apartments.

On either the second or the third day of June, 1921,
having just returned from one of his "commercial trips,"
the defendant stepped into the apartment of the Rodgers
and stated that he desired to pay his rent in advance,
adding that, on the following day, he intended leaving "on
a mission and a commission and would probably be gone
a month or a month and a half and may be longer." The
defendant then returned to Santa Rosa, leaving Mrs. D.
in occupation of their apartment in the Rodgers' apartment
house in San Jose, and, shortly thereafter, with the de-
ceased, went to their summer home on Konocti Bay.

On the twenty-ninth day of July, 1921—three days after
the death of his wife—the defendant returned to San Jose
and to the apartment at the Rodgers house, Mrs. D. being
still in said apartment. He arrived at the apartment near
the hour of 5 o'clock P. M., and at or near 8 o'clock of
that evening he and Mrs. D. were overheard by Mr. and
Mrs. Rodgers laughing heartily and joking together in their
apartment.

Mr. and Mrs. W. A. Miller were tenants in possession
of the premises owned by the defendant in the city of San
Jose. Approximately a week subsequently to the death of
Mrs. Spencer the defendant made his appearance at his
San Jose place and there saw Mr. and Mrs. Miller. "He
came to the door," testified Mrs. Miller, "very smiling and
apparently very happy, and I could hardly believe that it

was he whose wife had passed away. . . . I questioned him, 'Is it possible that it is you whose wife has recently been drowned?' He replied: 'It certainly was,' '' and asked Mrs. Miller ''how she found it out.'' Mrs. Miller, having in her possession a Santa Rosa newspaper which contained an account of the ''drowning,'' gave the article to the defendant, and, on reading it, he declared that the account so given was incorrect. He then proceeded to explain that he and his wife had been on a picnic with several friends, some of whom, at the conclusion of the picnic, preceded them to their side of the bay, others remained on the other side and still others on the lake in their boats; that just as they had reached the Holt wharf, on their side of the bay, and he was in the act of fastening the boat, Mrs. Spencer, who had been laughingly waving her hands and passing remarks to their friends standing on both sides of the bay, in some manner suddenly fell into the water; that he dove four times for her; that friends immediately came to his assistance, and that while he stood greatly horrified and appalled over the accident, some one of his friends saw her body come to the surface from under the boat and took the body from the bay and placed it upon the wharf; that vigorous but futile efforts were made to resuscitate her. To W. A. Miller, husband of the preceding witness, the defendant told substantially the same story, positively stating to him, however, that the ''drowning'' occurred in the daytime, in the presence and within the sight of some of his ''dearest friends.'' Miller suggested to the defendant that it was very peculiar that the body of his wife did not sink and remain submerged but floated about on the surface of the lake ''and he [defendant] didn't seem to want to say much after that.'' Miller further testified that, on an occasion prior to the twenty-sixth day of July, 1921, the defendant stated to him that his (defendant's) wife ''was quite a burden to him'' (defendant).

On the twenty-third day of August, 1921, Sheriff B. F. Shaul of Lake County, accompanied by District Attorney Churchill of said county, arrived in San Jose, where the defendant was then stopping, and placed the latter under arrest upon a warrant charging him with the crime of murder. On the way from San Jose to Lakeport, by way of San Francisco, the district attorney held several conver-

sations with the defendant. In one of these, being asked by the district attorney as to what had become of the shawl his wife was often observed to wear by her female friends, the defendant positively denied that she ever owned a shawl. Later, however, after the district attorney told him that the bay near Holt wharf was being dragged, he stated that he did recall that his wife had a red shawl, with white threads running through it, but that, when out fishing on the lake near Holt wharf one day, the wind blew the shawl and the hat she was then wearing from her and into the bay and that the hat and shawl were never recovered. Arriving at the city hall, in San Francisco, where the defendant was temporarily placed preparatory to taking the boat for Sausalito and thence by train and other conveyances to Lakeport, the defendant was further questioned about the death of Mrs. Spencer, and after this interview was ended he called the district attorney aside, and said to him: "Mr. Churchill, I would like to see you privately a moment. I have something I would like to take up with you," to which Churchill answered: "All right, Mr. Spencer, some time— we will have plenty of time to talk about it." Subsequently, the sheriff, with Spencer, and also accompanied by the district attorney and the latter's son, took the Sausalito boat at San Francisco, on their way to Lakeport. The district attorney and his son took a seat on the lower deck of the ferry-boat near the door at the front end of the boat. The sheriff and the defendant stepped outside at the front end of the boat, lower deck, and stood for awhile in conversation, which the defendant started by asking the sheriff questions as to the legal procedure according to which the charge against him would be investigated by the authorities. The sheriff explained that either a preliminary hearing could be had before a magistrate, in which case, if the evidence warranted it, he would probably be held for trial in the superior court, or the charge could be inquired into by the county grand jury, in which case, if there was evidence to justify it, an indictment could and certainly would be found charging him with murder. The sheriff further stated to him that he did not know which course would be taken up in his case—that it would largely depend upon the district attorney's judgment. The defendant then asked: "Who has the final say whether I shall

be dismissed or not?'' The sheriff replied: ''Well, the magistrate always has the say, but he always acts upon the suggestion of the district attorney, so practically it is up to the district attorney, or,'' continued the sheriff, referring to the contingency that the matter might be taken before the grand jury instead of a magistrate, ''of course, it would practically be the same proposition, as the grand jury would look to him [the district attorney] to produce the evidence.'' The defendant thereupon asked the sheriff what salary the district attorney received and the reply was that the district attorney's salary in Lake County was $1,500 per annum. ''That is not enough,'' retorted the defendant. The latter then or immediately left the sheriff and walked into the boat and took a seat by the side of the district attorney. He asked that officer whether or not he had interviewed all the witnesses; asked who would have the management of the case; whether District Attorney Hoyle, of Sonoma County, would be called in to assist in the prosecution. The district attorney assured the defendant that he had not interviewed all the witnesses; that he would perhaps alone handle the case, and that Hoyle would not be asked to assist him in the prosecution. This conversation then followed: Defendant: ''Upon your investigation, is it final, is your judgment final?'' Churchill: ''Mr. Spencer, as a rule, when the district attorney goes into a case, and is satisfied that the evidence would not warrant a conviction, why, it would not be taken up by any other authorities, although the grand jury could take up the matter and investigate it regardless of what the district attorney would advise, but as a rule it is final.'' No further conversation along this line was had until after the party boarded the train at Sausalito and were on their way to Santa Rosa. On the train the district attorney took a seat with the defendant. The latter immediately introduced the following conversation: ''Mr. Shaul [referring to the sheriff] is a fine gentleman; he has treated me nicely. Do you think it would be all right to hand him fifteen or twenty dollars?'' Churchill: ''You would have to take that up with him, Mr. Spencer.'' Defendant: ''Back in Ohio [or Iowa, the district attorney could not recall with certainty which], I know of a case where the district attorney was given $200 for not prosecuting a case. Do you

think that would be a proper thing to do?" Churchill:
"It depends on the man, Mr. Spencer." Defendant:
"Now, you must understand that I was the defendant in
that action." During this conversation, so testified Church-
ill, the defendant grew "as white as paper in the face
and panted like a running dog." The defendant, however,
proceeding with the conversation, began to ply the officer
with questions concerning the latter's financial condition,
the district attorney finally telling him that he was poor,
that there was a mortgage on his house and that it was
difficult for him to live on his salary. The defendant then
asked the prosecutor if he would like to live on Konocti
Bay, to which Churchill replied in the affirmative, saying
that he had always wished to own a home on that part of
the lake. The defendant then stated to the officer that he
(defendant) owned 113 feet of land bordering on the bay
and that fifty feet were enough for his (the district attor-
ney's) purposes, "and you can have that, Mr. Churchill."
The defendant went on to say that by "going in together"
he and the officer could buy lumber for building houses on
the property on Konocti Bay much cheaper than it could
otherwise be purchased for, adding: "You needn't be out
anything only for a man to help you lay the heavier lum-
bers."

The proposition of the defendant to remunerate the dis-
trict attorney on condition that he would cease the prosecu-
tion of the case, or, in plain language, the proposition to
bribe the district attorney, was again taken up after the
defendant had been placed in the county jail at Lakeport.
The district attorney had called to see the defendant in
response to a message carried from the defendant to that
officer by the sheriff that defendant desired to see him.
Upon entering the jail and into conversation with the
defendant, the latter proposed to convey to the district
attorney fifty feet of the 113 foot lot he owned on Konocti
Bay and in addition pay him $200 in cash upon condition
that the district attorney would not prosecute the case.
The district attorney suggested that if the defendant con-
veyed said lot to him (district attorney) it would readily
become known to the public, but the defendant stated that
he could have the deed acknowledged in San Jose and
that he would pay the district attorney the $200 in

greenbacks. A few days after this conversation, under an understanding between the district attorney and the sheriff, the latter officer took the defendant out for a ride in an automobile. While they were out on this trip a dictagraph was installed in the jail and connected with the sheriff's office and on the next day the district attorney again interviewed the defendant and caused him to renew his bribery proposition. While this conversation was going on the sheriff of Sonoma County and the sheriff of Lake County were at the end of the dictagraph in the sheriff's office and heard a considerable portion of said conversation. They corroborated the district attorney in many vital particulars relative to the bribery proposition. It seems that, after this conversation had been concluded and the district attorney had left the jail, the defendant, by some means, discovered the dictagraph in the stove-pipe, near which the chairs stood on which the district attorney and the defendant sat while they were engaged in conversation, and on the following day, when the district attorney again called at the jail and saw the defendant, the latter told him of having discovered the dictagraph, and exclaimed: "My God, man, don't you know they had a dictaphone in on us here? It has been here ever since I have been here. Didn't you know they heard what was said last night? . . . My God, didn't you know that was in here?" The district attorney replied that he knew nothing of the existence of a dictagraph in the jail and asked what it looked like, whereupon the defendant went to the stove-pipe in which the instrument had been placed, took it out and put it back face down. After some further conversation the district attorney asked defendant if he was not afraid to proceed with the matter of the proposed bribe "with this dictaphone down in there," to which the defendant replied: "No, it takes a direct wave to operate that thing. Let us move our chairs over here," and thereupon the chairs were moved some distance from the stove-pipe. The defendant then repeated his proposition to bribe the district attorney. The conversation on this occasion was thus concluded: Question by Mr. Churchill: "Mr. Spencer, if I conclude to prosecute this case, what do you expect to be done with these moneys and this deed?" By defendant: "Why, what would you expect?" Churchill: "I would ex-

pect the money to be returned.'' Defendant: ''Of course that would be the right thing, wouldn't it? Now, of course, Mr. Churchill, you know that this is not a bribe.''

In addition to the facts and circumstances embraced in the foregoing statement, there was other significant testimony presented at the trial, some of which went to the impeachment of certain of the extrajudicial statements of the defendant. Doctors Yates and Bonar testified that they had professionally treated the deceased—the one on the 11th and 15th of February, 1921, and the other in the month of May, 1921—and that they had found, upon examination, that her lungs, heart, and kidneys were at those times perfectly normal.

Mrs. Laura Taylor, a neighbor of the Spencers on Konocti Bay, and who had had several years' experience as a professional seamstress, testified that a few days prior to the death of Mrs. Spencer the latter came to her as she was sitting in her car with her husband preparatory to going to Lakeport and, handing to her a sample of a khaki skirt which the deceased was then making, and also a ten-cent piece, asked her to purchase for her (the deceased) a spool of thread which would match the skirt. The defendant accompanied the Taylors to Lakeport that morning and on arriving at that place Mrs. Taylor went into a store and purchased thread which she said perfectly matched the skirt of which she had in her possession the sample given her by Mrs. Spencer and for which she paid five cents, receiving five cents in change. She delivered the thread, together with the five-cent piece, to Spencer and requested him to deliver them to his wife. At the trial the khaki skirt was exhibited to Mrs. Taylor and upon an inspection of it she testified that the material was the same as the sample which Mrs. Spencer had given her and that the thread used in making the skirt was the same as that she purchased for Mrs. Spencer on the occasion referred to.

As to the circumstance of the body of the deceased floating on the surface of the water, the testimony of Dr. Bonar, who had made a special study of cases of drowning, was that invariably, unless prevented by some external physical cause, the body of a drowned person would immediately sink to the bottom of the water in which the

drowning took place. He stated, however, that, in the case of a woman entirely dressed, as was true in the present case, the buoyancy following from air getting underneath her clothing might, and probably would, cause the body to float on the water before sinking for possibly a period of half an hour. "It requires very little to buoy a body in water," he added. He further stated that a dead body thrown into water would not sink and that this would be generally true even if the person had died from drowning and the body again put into the water. He was asked if a drowning person would not invariably take water into the lungs, to which question he replied in the negative, stating that out of 247 cases of drowning occurring along the Atlantic coast and in which autopsies had been performed by the public health service in only forty-eight per cent thereof was there water found in the lungs. He stated, however, that in cases of drowning water would always be taken into the stomach. He stated that if the deceased had died from heart failure before her body went into the bay water would not have entered the stomach or lungs or passed out of her mouth after the body was retrieved from the bay. Asked as to approximately the length of time a body would retain its warmth after the death thereof, the doctor stated, considering all the conditions in this case as they were described by the witnesses, that the body would probably retain a temperature from three to four hours. And, lastly, basing his judgment upon the testimony as to the conditions under which the body was found and taken from the bay, the doctor expressed the opinion that the deceased was dead before the body reached the water at the Siddell wharf.

The defendant himself did not take the witness-stand. A few witnesses, however, were introduced by him. This testimony, though, with the single exception perhaps of that of Dr. W. H. Fearn, of Lakeport, involved no material contradiction of or variance from that produced by the people. It was stipulated that a number of Indians at the Indian camp on the night of the death of Mrs. Spencer would testify, and that such testimony might be deemed to be before the jury, that they heard no scream from a human voice, the sound of which came from the direction of the Holt wharf at the time mentioned by Hudson Jack,

but that testimony is merely negligible, and it is obvious that it could have very slight, if any, tendency to disprove or impeach the truthfulness of the Indian boy's testimony.

Dr. Fearn testified that the body of a drowned person, if taken from the water immediately, or within a few minutes after the drowning occurred, and then again immediately put back into the water, would immediately sink. This, the doctor continued, was due to the fact that the chest of a person dying from drowning becomes "contracted on account of the terrific struggle to get air, the spasm of the epiglottis set up by water entering the throat, so a person drowning has no air or very little air in the lungs. That is the reason," continued the doctor, "that the body usually sinks." He did state, though, that a person, clothed as deceased was at the time of her death (with waist, skirt, underclothes, shoes, and a man's coat), where the surface of the clothing was wet—that is, not soaking but merely damp—the air caught in such clothing would be held there as readily and for as long a time as it would be if the clothing were perfectly dry, and that the body would be likely to remain floating on the surface for from five to ten minutes.

While, as will be noted, there is apparently some conflict between the testimony of Dr. Bonar and that given by Dr. Fearn, viewing said testimony from the standpoint of the theory maintained by the people that the defendant took the life of the deceased by drowning her and then, subsequently, again throwing her body into the bay at the Siddell wharf, such conflict involved a matter which it was entirely for the jury to solve and determine.

We have now presented herein rather an elaborate synoptical statement of the facts and circumstances from which the jury seemed to have felt justified in forming the conclusion that the defendant was guilty of the crime as charged against him, also referring to some of the testimony introduced on behalf of the defendant. This extended statement of the evidence seemed to us to be justified, since, as stated, and as a reading of the statement will readily show, the essential support of the theory of guilt upon which the people proceeded was necessarily dependent upon evidence of manifold and diversified circumstances. There are many minor circumstances to which it was thought that a

reference herein was unnecessary, those comprehended
within the above statement being the salient or vitally im-
portant circumstances and facts brought out at the trial.

1. The first question submitted by this appeal is: Was
the *corpus delicti* proved? And this is the all-important
question, for obviously, failure to establish the *corpus de-
licti* is failure to prove that a crime has been committed.
The solution of the problem thus propounded must rest
upon the determination of the question whether the evi-
dence, of which an extended and accurate conspectus has
been reproduced herein, is such, when reasonably inter-
preted as a whole, as to afford a rational and just con-
clusion by intelligent minds, unfettered by passion or
prejudice, that the deceased came to her death by violent
means; and this question may best be answered by a reply
to the following: Can a court of review justly declare, as
a matter of law, after carefully considering the evidence
exposed by this record, that the jury could not have been
justly persuaded by said evidence, to a moral certainty
and beyond all reasonable doubt, that the defendant took
the life of his wife by violent means, with the deliberate
purpose of accomplishing that act? In other words, are
we, as a reviewing court, compelled to hold that the in-
numerable inculpatory and strongly accusing circumstances
developed by the evidence were by the public authorities
and the jury aimed in the wrong direction or were so mis-
interpreted or their probative significance so misunderstood
as that an erroneous result was reached? If this court is
not legally authorized to answer these questions in the
affirmative, the conclusion must necessarily be that, from
the evidence as a whole or considered in its entirety, the
jury were *legally* convinced, to a moral certainty and
beyond all reasonable doubt, that the defendant committed
the crime as charged in the indictment, and, therefore, we
are required to hold that the *corpus delicti* was likewise
established.

[1] It cannot be doubted that the *corpus delicti* may be
proved by the very facts that connect the defendant with
the commission of the crime, and this, according to the
verdict, which, we may as well say here, we feel that we
are bound to accept, is precisely what was done in this case.

The basis of the *corpus delicti* is the finding of a dead

human body, or its remains, and the identification thereof
as that of a person charged to have been slain. The next
essential step is to show that the death of the person has
been occasioned by the criminal act or agency of another.
And "it is not necessary that the *corpus delicti* should be
proved by *direct and positive evidence.* Crimes, and es-
pecially those of the worst kinds, are naturally committed
*at chosen times, and in darkness and secrecy;* and human
society must act upon such indications as the circumstances
of the case present or admit, or society must be broken up.
Nor is it very often that adequate evidence is not afforded
by the attendant and surrounding facts to remove all
mystery, and to afford such a reasonable degree of cer-
tainty as men are daily accustomed to regard as sufficient
in the most important concerns of life; to expect more
would be equally needless and absurd." (Rice on Evi-
dence, p. 466.) Again, the same author (vol. 3, p. 467)
approvingly quotes the rule laid down by Burrill, in his
work on Circumstantial Evidence, page 682, wherein it is
said that the death and identity of the body of the person
who it is charged has been slain, having been shown, the
fact that death was produced by a criminal act may be
shown "by means of circumstantial evidence, including the
presumptive kind; and, for this purpose, a much wider
range of inquiry is allowed than in regard to the funda-
mental fact of death; and all the circumstances of the
case, including *facts of conduct on the part of the accused,*
may be taken into consideration."

"Nor," as is said in *Carroll* v. *People,* 136 Ill. 456, 463
[27 N. E. 18, 21], "is it essential that the *corpus delicti*
should be established by evidence independent of that which
tends to connect the accused with its perpetration. The
same evidence which tends to prove one may also tend to
prove the other, so that the existence of the crime and the
guilt of the defendant may stand together inseparable on
one foundation of circumstantial evidence."

The rules above stated are now so generally accepted in
all the American states as well as in England that they
have become elementary in the law.

[2] The present case is replete with circumstances, in
their nature highly incriminatory and tending strongly to
the establishment of the proposition that the death of the

deceased was the direct result of the criminal act of the defendant. And we cannot say that the jury were not warranted in reaching the conclusion that she was drowned by the defendant (perhaps by placing and holding her head under the water a sufficient length of time to produce death), the body then conveyed by him to the Siddell wharf and there by him cast into the bay. The salient circumstances may be recapitulated: The motive to get rid of his wife, supported as it was by uncontradicted evidence that he was enamored of a married woman to the point of infatuation and the maintenance of illicit relations between him and said woman; the violent differences or quarrels occurring between the defendant and the deceased over the fact of his undue and unholy attentions to said woman, and the abusive language in which he addressed his wife on those occasions; the statement prior to her death that his wife was a great burden to him; the scream of the human voice, the sound of which came from the direction of Holt wharf; the floating of the body on the surface of the water after the drowning, it having been shown by not only the doctors who testified for the people but the doctor who testified for the defendant, that the body of a person drowning would sink to the bottom and not remain floating upon the surface of the water and that this would probably occur in from five to ten minutes even where a drowning person was a woman and sufficient air had gotten underneath her clothing to operate as a buoy; the testimony of two doctors to the effect that they had had occasion professionally to examine the deceased about two months prior to her death and found that her kidneys, lungs, and heart were in perfect condition, which diagnosis was confirmed by the autoptical physician; the impeachment by Mrs. Taylor's testimony of the reason given by the defendant for the visit to the Siddells at so late an hour of the night, to wit: to have Mrs. Siddell procure for the deceased some thread to match the latter's skirt; the cold-blooded nonchalance with which he accepted the fact of his wife's sudden passing; the contradictory and untruthful stories he told of the circumstances of his wife's death and the time of day at which it occurred; the offer of a bribe to the district attorney as an inducement to dismiss the proceedings against him, a fact constituting well-

nigh irrefragable evidence of the consciousness of guilt,—these and the many other circumstances above narrated herein, all of which stand in the record entirely unexplained and uncontradicted and which, if true and believed so to be by the jury (and it was entirely the function of the jury to determine whether they were or were not true), would seem to leave no other course open to a body of intelligent and fair-minded men and women to whom the question of the defendant's guilt or innocence was submitted but to find him guilty as charged.

Of course, any conflict arising in the testimony addressed to any particular vital circumstance in the case was for the jury to solve and determine, and this is true as to any real or apparent inconsistencies which may have arisen in the testimony of any witness. If there is substantial evidence in the case warranting the conclusion at which the jury arrived, it becomes immaterial upon appeal whether there was or was not a conflict in the evidence or any inconsistency in the testimony of any particular witness. These rules are elementary and their mere statement is conclusive of their correctness.

Upon this branch of the case, we hold it to be our duty, in view of the convincing circumstances of guilt brought out by the evidence, to leave the case where the jury left it, superadding, however, the expression of our conviction, following from a critical examination and consideration of said evidence, that the defendant was, indeed, fortunate that the verdict was of a character to relieve him of the requirement of suffering the extreme penalty annexed to the crime of murder by the law of this state.

2. It is next contended that error was committed by allowing the people to show that Hudson Jack, the Indian boy, had, prior to the trial, made a statement with reference to the scream that he testified to having heard which differed in a certain important particular from his testimony upon that subject. Hudson Jack was asked, on his examination by the district attorney, whether the scream that he heard was that of a man or a woman, to which he replied that he did not know. The district attorney thereafter called H. R. Taylor and asked him about a conversation he had had with the Indian boy on the morning following the day of the death of Mrs. Spencer, in which,

after telling him of the death of Mrs. Spencer, the Indian boy replied either that ''I heard *her* holler'' or ''We heard *her* holler.'' This so-called impeaching testimony was offered by the district attorney and allowed by the court upon the theory that it came within the terms of section 2049 of the Code of Civil Procedure, which reads as follows: ''The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section two thousand and fifty-two.''

[3] The purpose of the above section is to permit a party who has, in good faith, placed a witness upon the stand, with the distinct understanding that he will give testimony in support of his side of the issue, but, instead of so doing, and to the surprise of the party presenting him as such witness, has given damaging testimony against said party, to show that, prior to giving his testimony, he made a statement which, if testified to, would be favorable to the party so making him his witness. When invoked on appropriate occasions, this section involves a most salutary rule of evidence. (*Zipperlen* v. *Southern Pac. Co.*, 7 Cal. App. 206, 214, 217 [93 Pac. 1049].) But, to entitle the party to contradict such a witness, it must appear that he was taken by surprise by the testimony of the witness and that said testimony, as stated, was prejudicial to his case. A party has no right to invoke the aid of that section merely for the purpose of getting into the record testimony which otherwise could not be brought thereinto because of its incompetency. ''The mere failure of a witness to give favorable testimony for the party producing him does not entitle such party to prove that he has made contrary statements elsewhere.'' (*People* v. *Creeks*, 141 Cal. 532 [75 Pac. 103]; *People* v. *Cook*, 148 Cal. 334, 345 [83 Pac. 43]; *Zipperlen* v. *Southern Pac. Co., supra.*)

[4] In the present instance, the testimony of Taylor was not admissible under the section above referred to. It does not appear from the record that the district attorney, when he put the Indian on the witness-stand, expected any other testimony from him than that given by him, and if there was a material difference between the testimony as

58 Cal. App.—15

given by that witness and the statement which Taylor testified that the Indian had previously made to him, then the effect of allowing the testimony of Taylor would be to admit into the record hearsay evidence. And, even if there was no material variance between the two statements, the testimony of Taylor would still be incompetent, as the testimony of a witness cannot be bolstered by showing that he had extrajudicially made, at some time prior to the giving of his testimony, the same statement that he has made as a witness.

But, when scrutinizingly analyzed, and so considered, or as it may reasonably be interpreted, we cannot see that there is any material difference between the testimony as a whole of the Indian boy and the statement which the witness Taylor testified that the boy made on the occasion referred to. The district attorney, it will be recalled, after getting from the Indian boy a statement that he had heard a scream but did not know whether the voice was that of a man or a woman, asked him if the scream was from a ''light'' or a ''heavy'' voice, to which the lad replied that it was a ''light'' voice. From this, the inference is reasonable, or would be so to any person of fair intelligence, and, in support of the verdict, we may assume that the jury drew that inference from said reply of the witness, that, in thus using the terms ''light'' voice and ''heavy'' voice, the district attorney intended to convey to the Indian's mind the distinction between a female voice and a male voice, the term ''light'' voice being, naturally, intended as a description of a female voice and the term ''heavy'' voice likewise intended as a description of a male voice. Under this view, therefore, which we take to be well founded, the jury could, with good reason, have inferred, from the answer made by the Indian to that question, that what he meant to say was that, while he could not positively answer whether the voice was that of a male or a female, it, nevertheless, being a ''light'' voice, sounded more like that of a female. At any rate, the jury, it must be assumed, understood the question of the district attorney as involving, descriptively, the distinction between a male and a female voice and could have accepted the statement of the Indian that the voice that screamed was a light voice as a circumstance tending strongly to show the scream was that

of a female, and, therefore, the testimony of Taylor as
to the statement made to him by the Indian could add but
little, if any, force to the testimony which was competently
before the jury, the purpose of which was to prove that
the scream of a woman was heard at the time stated by
the Indian. From this consideration, or even if there may
be perceived some variance between the statement which
Taylor testified the Indian made to him and the testimony
of the Indian, it is apparent that the ruling admitting Tay-
lor's testimony could not have materially contributed to-
ward the crystallization of the result arrived at below.
Indeed, even if it be conceded that there is some variance
between the two statements, it will be admitted that it is so
slight that we are justified in declaring that, in view of
the entire record, the effect of the ruling allowing Taylor's
testimony was not to produce a miscarriage of justice.
(Const., art. VI, sec. 4½.)

[5] 3. The "demonstration" to which objection is here
registered and which it is claimed resulted in great preju-
dice to the accused at the trial arose in the following man-
ner: Pending the trial, and before the people had closed
their case, a test was made by Sheriff Shaul and Mr. and
Mrs. Siddell to ascertain whether the scream of a woman
made at Holt wharf could be heard at the Indian camp
where Hudson Jack was at the time that he said he heard
the scream of someone on the night of the death of Mrs.
Spencer. The sheriff went to the place where Jack said he
was at the time and Mr. and Mrs. Siddell went to the Holt
wharf. While thus they were stationed, Mrs. Siddell
screamed three times, the first time quite loud, and, at the
request of the sheriff who called to her from where he was
standing, she gave a second scream in "a softer voice" and
then another scream "still softer." The sheriff was called
to the stand and testified that he heard all three screams
distinctly. Mr. and Mrs. Siddell corroborated his testi-
mony as to the making of the test. The ground of the ob-
jection to the testimony as to the test so made was and is
that the test was not made under precisely the same con-
ditions as those which existed on the evening that Hudson
Jack claimed to have heard the scream of a human voice
coming from Holt wharf. The difference in the conditions
appears to be this: That Hudson Jack said he was lying

upon his bed when he heard the scream, whereas the sheriff was in a standing position and out in the open when the test to which he testified was made; also Siddell testified that the night on which the drowning occurred was a calm, still, bright night, with no wind blowing or any disturbance from any source, while the night the test was made the wind was blowing and noises incident to disturbances of the waters of the lake by the wind were going on. We are of the opinion that the objection is without substantial merit and goes more to the weight of the testimony than its competency. "Rarely, if ever, can an experiment be made where the conditions are in every respect a reproduction of those into which an inquiry is being made. The rule requires only substantial likeness" (*State* v. *Nowells,* 135 Iowa, 60 [109 N. W. 1018]), and we think that in this case the conditions were substantially the same on the night that the experiment was made as they were on the night of the drowning. If anything, the atmospheric and climatic conditions at the time that the test was made were less favorable to the hearing of a scream at the distance existing between the point where Hudson Jack was and the point where the scream seemed to proceed from than they were on the night Mrs. Spencer's life was lost.

In *People* v. *Phelan,* 123 Cal. 551, 568 [56 Pac. 424, 431], a question similar to that which we now have in hand was disposed of by the supreme court, per Chief Justice Beatty, as follows: "Exception was taken to certain rulings of the court admitting evidence of experiments made by direction of the prosecution for the purpose of contradicting the testimony of some of defendant's witnesses. The testimony related to sounds heard in the night-time in the vicinity of defendant's cabin. The experiments were conducted at the same place, but in the daytime, and it was not shown that the atmospheric conditions—such as humidity, temperature, *et cetera*—were the same. The court did not err in admitting this testimony. The principal conditions were the same, and the jury could weigh and make allowance for the differences referred to. They affected the weight, but not the competency, of the evidence."

There are several other exceptions to the action of the court in allowing certain testimony to be given. These we have

carefully examined and thus have been convinced that, even conceding the objections or some of them, to be well taken, no injury resulted to the defendant therefrom. As to these objections and as to the record generally in this case, the following observations made in the case of the *People* v. *Fealy,* 33 Cal. App. 605, 615 [165 Pac. 1034, 1038], which, like this, was one in which the proof of the crime charged was dependent entirely upon circumstantial evidence, are of cogent pertinency to this case: ''It [the crime charged] was supported by what appears to be very powerful circumstances; and, while it is no doubt true, as might reasonably be expected and, indeed, quite unavoidable in a case where, as in this, multitudinous as well as multifarious circumstances are required to be shown to prove the ultimate fact, some erroneous statements or testimony found their way here and there in the record, still a careful examination and consideration of all the testimony has convinced us that, in the main, the testimony complained of was not only pertinent to the case but legally competent, and that the few errors which were committed were of little consequence, or bore upon matters which, in view of the strong circumstantial case legitimately made against the defendant, could have exerted no baleful influence in bringing about the result arrived at by the jury.''

We have painstakingly and with earnest solicitude examined this record, deeming it not in contravention of ordinary propriety to elaborately review the facts herein, since the case is one, so far as the people were concerned, which, as must now be apparent, was planted entirely and exclusively upon circumstantial evidence and, so far as the defendant is concerned, is of obvious moment. We have not from this investigation been able to persuade ourselves that the jury reached an erroneous conclusion upon the question of the guilt or innocence of the accused, or that the errors of law as assigned by the defendant were such as to justify us in holding that he was not accorded a fair and impartial trial.

The judgment is, therefore, affirmed.

Burnett, J., and Finch, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 17, 1922.

All the Justices present concurred.

Richards, J., *pro tem.*, and Myers, J., *pro tem.*, were acting.