JAMES CARROLL

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa March 30, 1891.*

1. CRIMINAL LAW—*evidence necessary to convict—generally.* Before one can properly be convicted of crime, it is incumbent on the prosecution to prove, beyond a reasonable doubt, first, that the crime charged in the indictment has been in fact committed, and second, that the prisoner is the person who committed it. But neither proposition is required to be established by direct evidence.

2. SAME—*corpus delicti—proof necessary — circumstantial evidence.* Circumstantial evidence may be resorted to for the purpose of proving the *corpus delicti*, on a prosecution for an alleged offense, in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense, if it be satisfactory.

3. No one should be convicted until it is in some way made clear that a crime has been committed; yet there can be no one kind of evidence to be always demanded in proof of this fact, any more than of

any other; nor is it essential that the *corpus delicti* shall be established by evidence independent of that which tends to connect the accused with its perpetration.

4. A person may be convicted of a larceny of money by circumstantial evidence satisfactorily implicating him, without bringing every one as a witness who may have had an opportunity of stealing and secreting the same, and proving by him that he did not take it.

5. ERROR WILL NOT ALWAYS REVERSE—*giving instructions.* The court will not reverse a judgment of conviction for crime for an inconsistency in the two sets of instructions, where the fault is with the instructions given at the request of the party complaining.

6. Where a party is not prejudiced by the giving of an instruction not based upon any evidence in the case, he can not have a reversal for such error.

WRIT OF ERROR to the Circuit Court of Knox county; the Hon. JOHN J. GLENN, Judge, presiding.

Mr. J. A. McKENZIE, and Mr. F. F. COOKE, for the plaintiff in error.

Mr. GEORGE HUNT, Attorney General, and Mr. J. J. TUNNI-CLIFF, State's Attorney, for the People.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

At the February term, 1881, of the Circuit Court of Knox county, James Carroll, the plaintiff in error, and two others, were jointly indicted for the crime of larceny, the indictment charging them with feloniously taking, stealing and carrying away a large amount of money in United States treasury notes and bills of national banks, the goods, chattels and money of the Farmers' and Mechanics' Bank, a corporation organized under the laws of this State. At the June term, 1887, of said court, said Carroll was tried on said indictment upon a plea of not guilty, and at such trial the jury found him guilty as charged, and found the value of the property stolen to be $9500, and fixed his punishment at imprisonment in the penitentiary for the term of eight years. A motion for a new trial

having been made and overruled, judgment was pronounced upon said Carroll by sentencing him to imprisonment in the penitentiary at Joliet for the term fixed by the verdict. To reverse said judgment, a writ of error returnable to the October term, 1890, of this court has been sued out, and on that writ the record is now before us for review.

. The grounds urged for the reversal of the judgment are, that the evidence fails to support the verdict, and that there was error in one of the instructions to the jury given at the instance of the prosecution.

The larceny charged was committed on the 3d day of July, 1879, between the hours of twelve and one o'clock in the day time. The Farmers' and Mechanics' Bank is a corporation organized under a special act of the General Assembly approved March 31, 1869, and at the time of said larceny, was doing a banking business, having its bank on the corner of Main and Broad streets, in the city of Galesburg. The banking office consisted of a room, oblong in form, the entrance being by double doors in the center of the Main street front. The counter, which was surmounted by a screen, and which divided the portion of the bank to which the public were admitted from the cash room, commenced at the front, on the left hand side of the entrance, and after running back a sufficient distance to give a suitable space for the use of those desiring to do business with the bank, turned a right angle and ran, parallel with the front of the room, to within a short distance of the wall on the right hand side, and there again it turned a right angle and ran, parallel with said wall, to a point about two-thirds of the way to the rear end of the room, where the passage-way thus formed terminated in a door opening into the cash room. Said door had no knob on the outside, but was furnished with a spring-bolt on the inside which fastened the door whenever it was closed, and required the use of a key to open it from the outside. Directly opposite the front entrance to the bank was the cashier's counter, with an open-

ing in the screen through which he transacted business with customers. Some distance behind the cashier's counter and near the center of the bank was a desk, and nearly opposite the desk, at the left hand side of the cash room was the cash table.

At about twelve o'clock at noon of the 3d day of July, 1879, Francis Colton, the president of the bank, and P. F. Brown, its teller, left the bank to go to their dinner, the only person remaining in the bank being William H. Little, the cashier, a man then between sixty-five and seventy years of age. As they left, the door leading into the cash room was closed and fastened. When they went out of the bank, there was lying on the cash table in the cash room, of moneys belonging to the bank, a pile of United States treasury notes and national bank notes of various denominations, amounting to $9500. Colton returned in about an hour, accompanied by his son, and on reaching the door opening into the cash room, he found it slightly ajar, and on entering the cash room he found that said money which he left lying on the cash table was gone. Search was immediately made for it by Colton, Brown and Little in every part of the bank, but it was not then and never has been found. As Colton's son entered the bank with his father, he discovered a screw-driver lying on the floor in the passage-way just outside of the door leading into the cash room, and on examining the bolt by which said door was fastened, marks or scratches were found on it made apparently with a screw-driver or other similar instrument, in attempting to force back the bolt so as to open the door.

The evidence shows that Carroll, and also the two other men who were indicted jointly with him, were strangers in Galesburg, and that on the day on which said money disappeared, and for two or three days prior thereto, they were in the city, and on one or more occasions were seen together by the witnesses. On several occasions during that time, and especially on the day of the robbery, Carroll was seen at or in the im-

mediate vicinity of said bank. William Secord testifies that
on July 2, 1879, the day before the robbery, he saw Carroll
in front of the bank. F. B. Kirch, the bar-tender at the Union
Hotel, a building adjoining said bank on the west, testifies
that he saw Carroll, and also his two co-defendants, in said
hotel on several occasions during the time they were in Gales-
burg. E. A. Farr testifies that he saw Carroll, on the 3d day
of July, 1879, standing in front of the door of the Union Hotel.
D. B. Jackson testifies that he saw Carroll a few minutes after
ten o'clock in the forenoon of the day of the robbery, in the
bank writing something on a piece of paper; that at about
twelve o'clock of the same day, or a little after, the witness
came out of the Union Hotel and saw Carroll standing between
the hotel and bank; that witness walked part way across the
public square, which is situated across the street in front of
the bank, and turning around, saw two other men, one of
whom he recognized as one of Carroll's co-defendants, between
the bank and the store across the street to the east; that he
saw those men go into the bank and afterward come out and
walk west. John Brown testifies that on the same day, at
about twelve o'clock, he came out of the bank, and walking
west, saw Carroll standing there.

Joseph Schruyver testifies that, on the 3d day of July, 1879,
at about noon, he was passing through the square and looking
over to the bank, saw a man standing at the cashier's window,
and at the same instant saw what appeared to be another man
dropping down behind him; that he ran over to the bank, and
as he reached it, he saw two men in the bank in front of the
window, and another man at the door on the second step who
took him by the arm and asked him if he knew of a man by
the name of Miller on that street who kept a feed store, saying
that he had a letter of recommendation to him, and said:
"Come, go with me until I find him." The witness is unable
to certainly identify the man who thus stopped him at the
bank door and prevented his entering the bank as the same

person with the prisoner on trial, except in this manner : The evidence shows that Carroll and his two co-defendants were arrested shortly after the commission of the larceny, and were at that time kept for some time in jail in Galesburg, and at that time the witness saw the man said to be Carroll, and identified him as the man whom he encountered at the bank door, although he is unable to testify that the defendant on trial some seven or eight years afterward is the same man. The identification, however, is made complete by the testimony of William Flemming, who says that on the same day, between twelve and one o'clock, he came around the corner and found Carroll there in conversation with Schruyver, and that Carroll also spoke to him about a man who had moved from Peoria and was running a feed store on the square.

The screw-driver found on the floor of the bank near the cash-room door was identified by George A. Higgins, a salesman in a hardware store situated on the same street with the bank, as a screw-driver sold by him to Carroll between twelve and half past twelve o'clock of the day on which the larceny was committed. The identification by this witness, both of the screw-driver as the one sold to Carroll, and of Carroll as the purchaser, seems to be positive and satisfactory.

Martin Thursan, a livery stable keeper at Monmouth, in Warren county, testifies that, on the morning of the day the larceny was committed, one of Carroll's co-defendants hired of him a team consisting of two horses and a spring wagon, without stating where he wished to go, and that he brought the team back at about four or five o'clock in the afternoon of the same day. Samuel Law, who resides in Warren county about one and one-half miles from Monmouth and about fifteen miles from Galesburg, testifies that in the afternoon of the same day, Carroll and another man came to his house, having with them a bundle, and wished him to take his team and carry them to Gerlaw, a station on a line of railway running north from Monmouth to Rock Island, about five miles from

the witness' place of residence, telling him that there was some-
one there whom they wished to see; that witness was reluctant
to go because both he and his horses were tired, but upon their
urging him and offering to pay him whatever he thought proper
to ask, he consented to go, and arrived at Gerlaw with them
at five o'clock in the afternoon, a train on said railway for
Rock Island being then due.

It seems that Carroll, after his first arrest, by giving bail or
otherwise, but how is not shown, obtained his liberty, and that
he was rearrested in St. Louis in August, 1886; that while he
was on the train being conveyed from St. Louis to Galesburg
in custody of the sheriff of Knox county, he requested of the
sheriff to be allowed to go to the water closet; that the sheriff
went with him, and as they were at the water-closet door,
Carroll suddenly forced the sheriff out onto the platform of
the car, and with the aid of others who seem to have been on
hand for the purpose, forced the sheriff over the rail of the
platform and jumped off the car with his hand-cuffs on, and
escaped.     The day following he was again arrested at East
St. Louis and returned to Knox county for trial.

No evidence was introduced by or on behalf of the defend-
ant, but it is claimed that, because Little, the cashier of the
bank, was not called as a witness, there was a substantial
failure to prove the *corpus delicti*.    It is said that, notwithstand-
ing all the suspicious circumstances pointing to Carroll and
his confederates, it may be that the money which is alleged to
have been stolen was paid out by Little on some large draft
during the absence of the president and teller, or was other-
wise disposed of by him, and therefore that it is not shown
beyond a reasonable doubt, that the money was in fact stolen.

It is true that before a prisoner can be properly convicted
of a crime, it is incumbent upon the prosecution to prove, first,
that the crime charged in the indictment has been in fact com-
mitted, and, secondly, that the prisoner is the person who
committed it.    But while it is true that these are two distinct

propositions both of which must be proved beyond a reasonable doubt, it is also true that neither is required to be established by direct evidence. Circumstantial evidence may be resorted to for the purpose of proving the *corpus delicti* in the same way and to the same extent that it may be for the purpose of connecting the accused with the commission of the offense. As said by Mr. Greenleaf: "The proof of the charge in criminal cases involves the proof of two distinct propositions: first, that the act itself was done; and secondly, that it was done by the person charged and by none other;—in other words, proof of the *corpus delicti* and of the identity of the prisoner. It is seldom that either of these can be proved by direct testimony; and therefore the fact may be lawfully established by circumstantial evidence, provided it be satisfactory." 3 Greenl. on Ev. sec. 30.

Mr. Bishop, in discussing the same subject, says: "If we look at the matter as one of legal principle, we can hardly fail to be convinced that, while the *corpus delicti* is a part of the case which should always receive careful attention, and no man should be convicted until it is in some way made clear that a crime has been committed, yet there can be no one kind of evidence to be always demanded in proof of this fact any more than of any other." 1 Bishop's Crim. Proced. sec. 1071.

Nor is it essential that the *corpus delicti* should be established by evidence independent of that which tends to connect the accused with its perpetration. The same evidence which tends to prove one may also tend to prove the other, so that the existence of the crime and the guilt of the defendant may stand together inseparable on one foundation of circumstantial evidence.

In the case before us, the circumstances shown by the evidence, standing as they do wholly uncontradicted and unexplained, lead to but one rational conclusion, namely, that the larceny charged in the indictment was committed and that Car-

roll and his confederates committed it. They were strangers
in Galesburg, and no attempt is made to show that they were
there on any legitimate business. On the day the money dis-
appeared, and up to. the time of its disappearance, Carroll
was seen by various witnesses in the bank or in its immediate
vicinity. When the president and teller of the bank left for
dinner, the door into the cash room was closed and bolted, but
when they returned, it was standing ajar, and the screw-driver·
found lying by the door and the marks or scratches on the
bolt create a very high degree of probability that the bolt was
forced back and the door opened while the president and,
cashier were absent by the use of the screw-driver, and the·
evidence is positive and uncontradicted that said screw-driver
was procured by Carroll, a very few minutes before it was used
for that purpose, at a neighboring hardware store. During
the time the other officers of the bank were away to dinner,
and at the time when the money must have been taken, two
men were in the bank standing at the cashier's window, in all
probability engaging the attention of the aged cashier, and
at the same time a glimpse was caught by one of the witnesses
of another man dropping down behind the cashier. The man
thus skulking in the cash room must have been the one who
had effected an entrance thereto by means of the screw-driver,
and who was able, while the cashier's attention was engaged
by the men standing at the counter, to take the money from
the cash table and get away with it. While all this was going
on, Carroll was standing on the steps of the bank, adroitly,
attempting to and succeeding in diverting the attention of those'
who approached from what was going on within, and prevent-'
ing their entering the bank.

Immediately after these occurrences, Carroll and his con-
federates disappeared. One of them had hired a team that
morning at Monmouth, but whether Carroll availed himself
of that means of conveyance in order to get away from Gales-
burg is not shown. It is shown, however, that at about the

middle of the afternoon, he and another man, having a bundle
in their possession, called at a farm house about a mile and
a half from Monmouth for the purpose of obtaining transpor-
tation, not to Monmouth, but to a small station on the same
line of railway about five miles away. ` The effect to be given
to the foregoing facts and circumstances as tending to establish
the defendant's guilt is very considerably reinforced by the
conduct of Carroll when under arrest for said larceny several
years later, in assaulting the sheriff having him in custody
and forcibly effecting his escape.

We have no hesitation in saying that the facts and circum-
stances thus shown, when all taken together, and in the ab-
sence of any explanation, are sufficient to produce in the minds
of reasonable men an irresistible conviction of the defendant's
guilt. There is nothing in the whole case pointing to any
other conclusion. True the cashier was not produced as a
witness, and there is of course a physical possibility that he,
during the absence of the president and teller, paid out the
large sum of money in question upon checks or bills, or that
he, during that short interval, embezzled and secreted it so
that it could never be found. The first of these possibilities
however is affirmatively disproved, since, in the usual course
of business, the checks and bills upon which the money was
paid would have remained in the bank as the vouchers for such
payments, and the president testifies that upon his return to
the bank no such vouchers were to be found. As to the theory
of embezzlement it may be said that there is absolutely nothing
in the case upon which that theory can be based. There is
not a syllable of evidence indicating in the least that the
cashier made way with the money, or that he was out of the
cash room for an instant during the absence of the other bank
officers. All the facts proved negative the possibility of his
so secreting the money, during the short interval given him
for the purpose, as to place it beyond the reach of the rigid
and thorough search which was made for it the instant its loss

30—136 ILL.

was discovered. The disappearance of the money being other-
wise satisfactorily accounted for, no room is left for a theory
which has not a scintilla of evidence to support it. If the
testimony of the cashier was essential to a conviction, then his
death or departure from the State at any time before the trial
would have rendered a conviction impossible. But we are
unable to see that his testimony was essential in such sense
as to make a conviction impossible without it. It was of
course incumbent upon the prosecution to establish the pris-
oner's guilt beyond a reasonable doubt, but the proof of facts
and circumstances, if sufficient of themselves to produce the
requisite degree of conviction, was all that was required, and
such, in our opinion, was the character of the evidence in this
case.

The instruction given to the jury at the instance of the
prosecution of which complaint is made was, in substance,
that the law presumes that the character of Little, the cashier
of the bank, was good, and that the jury should so consider it,
unless there was evidence in the case showing the contrary;
that in considering the question whether Little, as custodian
of the moneys of said bank, acted as an honest and upright
man would act in similar circumstances when the larceny was
discovered, the jury had a right to consider such presumption
raised by the law of his good character for honesty, together
with any facts and circumstances in evidence, tending to show
that he made no disposition of the missing money.

It may perhaps be justly said that there is no evidence
tending to show that Little made any disposition of the missing
money, and that the instruction therefore is obnoxious to the
criticism that it was not based upon the evidence. Beyond
that we see no material objection to it. But the defendant
most clearly has no reason to object to it upon the ground
here stated. One of the principal grounds upon which the
defendant claimed a right to an acquittal was, that so far as
the evidence showed, the missing money might have been made

away with by Little, and four instructions were given to the jury at his instance submitting to them that theory. Under these circumstances the defendant could not have been prejudiced by the giving of the instruction asked by the prosecution, even though it may have been based upon no evidence in the case.

It is also said that there is more or less of inconsistency between the instruction given for the prosecution on this point and those given for the defense. This may be and we think is true, but the fault is with the instructions given at the instance of the defendant. In those the law seems to be laid down more favorably for the defendant than he had a right to ask, while the instruction given for the prosecution, so far as it went, in our opinion stated the law correctly. The error therefore, if any was committed, was in favor of the defendant and at his instance, and it affords him no just ground of complaint.

We are of the opinion that the conviction of the defendant was warranted by the evidence, and we find in the record no material error of law. The judgment will accordingly be affirmed.

*Judgment affirmed.*